Charles ZANDFORD, Plaintiff,

v.

NATIONAL ASSOCIATION OF
SECURITIES DEALERS,
INC., et al., Defendants.

CA No. 93–1274(PJA).

United States District Court,
District of Columbia.

May 20, 1998.

Charles Zandford, Lewisburg, PA, pro se.

James M. Callender, Jr., Washington, DC, for Plaintiff.

Francis Joseph Warin, Gibson, Dunn & Crutcher, L.L.P., Washington, DC, for Defendants.

## MEMORANDUM OPINION

ATTRIDGE, United States Magistrate Judge.

This case is before the Court on remand from the Court of Appeals for the District of Columbia Circuit on two issues: (1) whether, and to what extent, the alleged misconduct of the defendants may not be shielded by absolute immunity; and (2) whether plaintiff Charles Zandford's causes of action are time barred under the applicable statutes of limitations. *Zandford v. NASD*, 80 F.3d 559 (D.C.Cir.1996) (Table) (per curiam).

Zandford's Fourth Amended Complaint describes a conspiracy between the defendants—the National Association of Securities Dealers [NASD] and two of its employees, Brian A. Hobbs and Roger B. Sherman—and the plaintiff's former employer, Prudential Bache [PB]. Prudential Bache, the securities firm that suspended Zandford in February 1984 and terminated him in March 1984 [4th amend. compl., ¶¶ 23, 29], is not named as a defendant.[1] Zandford claims that "NASD's named and unnamed staff members intentionally, willfully and maliciously conspired with PB and its agent, John P. Graner, [PB Regional Director of the Southeast Region], and violated the congressional and statutory authority of the NASD to 'frame' Zandford in an NASD disciplinary hearing" [4th amend. compl., ¶¶ 6, 16], and that "Hobbs and Sherman, in furtherance of their conspiracy with PB, concealed and fabricated material evidence to accommodate Graner's concocted and perjured testimony, and influenced and caused the DBCC to sanction Zandford" [*id.*, ¶ 43].

Zandford argues that his claims are not time barred pursuant to the "discovery rule" and the theory of "fraudulent concealment", which, he claims, tolled the various statutes of limitations on his six counts against the defendants. He suggests that it was not until some time between October and December 1992, during the New York Stock Exchange Arbitration of his complaint for breach of a settlement agreement against Prudential Bache [*see supra* n. 1] that "PB provided Zandford with various documents, including its correspondence with the NASD from 1984 to 1988 regarding Zandford's termination from PB" from which he *discovered*

---

1. October 2, 1990, Zandford brought a civil action against PB for its alleged role in what Zandford now terms a conspiracy. At the time, Zandford sued PB for breach of a November 25, 1986 settlement agreement. In 1991, the parties were directed to New York Stock Exchange Arbitration by the United States District Court for the District of Maryland. The binding arbitration began in December 1991, during which, Zandford contends, he learned of the conspiracy between PB and NASD, Hobbs and Sherman. [4th amend. compl., ¶¶ 1–5, 33–34]. The arbitration panel dismissed Zandford's complaint in January 8, 1993; thereafter, Zandford filed a motion to vacate the arbitration award. The United States District Court for the District of Maryland denied the motion on February 22, 1994. *See Zandford v. Prudential Securities, Inc.*, 94cv0036, 1995 WL 507169 (D.D.C. Aug.15, 1995). Zandford then filed a civil action in this Court against Prudential Securities *et al.* alleging conspiracy to cause malicious prosecution, breach of implied covenant of good faith and fair dealing, and intentional interference with business relations. *Id.* Judge Kessler granted defendants' motion to dismiss on August 15, 1995, finding that "Zandford is attempting to circumvent the decision of the NYSE arbitration panel and the opinion of the United States District Court for the District of Maryland." *Id.* The Court of Appeals affirmed the decision on February 21, 1997. *Zandford v. Prudential Securities*, 111 F.3d 963 (D.C.Cir. 1997) (Table) (per curiam).

**4**

the "existence of these documents, and the conspiracy and fraud that was perpetrated against him by the NASD and its named and unnamed staff members in confederacy with PB". [*Id.*, ¶¶ 4–5].

Zandford also argues that defendants Hobbs and Sherman were administrative investigators who *prosecuted* the plaintiff with "personal zeal" [*id.*, ¶ 40], and are not entitled to absolute immunity. Zandford suggests that "[t]he only prosecutorial discretion exercised in the entire NASD process is that exercised by the members of the DBCC . . . [who, he concedes,] are properly immune from suit". [Pl's supp. opp. at 2]. Notably, although Zandford claims Hobbs and Sherman were not prosecutors, he uses the term a number of times in his complaint to describe their actions. [*See, e.g.*, 4th amend. compl., ¶¶ 4, 38, 40, 52].

Zandford, who is presently serving 52 months in prison on a conviction for carrying out a scheme to defraud one of his clients while employed by the securities firm of Dominick and Dominick (a period of employment that followed his tenure with Prudential Bache [defs' supp. opp. at 7 n. 3] ), is seeking money damages for injury to his employability in the securities industry, embarrassment and emotional distress resulting from Hobbs' and Sherman's alleged actions. On June 22, 1993, Zandford brought this civil action. In his Fourth Amended Complaint, Zandford names six counts: (count I) civil rights conspiracy in violation of 42 U.S.C.A. § 1985(3); (count II) deprivation of property without due process; (count III) conspiracy to cause malicious prosecution; (count IV) common law conspiracy; (count V) tortious interference with contract; and (count VI) intentional interference with business relationships.

In addition to the supplemental briefs filed by the parties per an order of the Court, Zandford filed two motions during the pendency of this case on remand: First, a motion for leave to file newly discovered evidence in support of his reply to defendants'

renewed motion to dismiss [# 83] and, second, a motion to appear *pro se* and to submit a supplemental brief due to counsel's omissions [# 80]. The motions to appear *pro se* and to file newly discovered evidence were granted; the motion to submit a supplemental brief was denied. *See* 3/30/98 Order.[2]

Although the motion that precipitated the original decision was a motion to dismiss, on remand both the plaintiff and defendants have submitted material outside the pleadings, thus converting the motion to dismiss on the two remaining issues into one for summary judgment. *See* FED.R.CIV.P. 12(c); *McKinney v. Dole*, 765 F.2d 1129, 1134 (D.C.Cir.1985); *Gordon v. National Youth Work Alliance*, 675 F.2d 356, 360 (D.C.Cir. 1982).

### A. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

As will be explained in detail below, although the allegations of a *pro se* complaint are held to a less stringent standard, *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam), when read with the required liberality and accepting all of the plaintiff's allegations as true, Zandford's complaint fails under two legal standards—the doctrine of absolute immunity and statutes of limitations. Accordingly, the defendants are entitled to Judgement as a Matter of Law.

### B. Background/NASD Self–Regulatory Framework

What Zandford terms as his "regulatory nightmare" began with the filing by Pruden-

---

**2.** The Order granting plaintiff's motion to appear *pro se* states that Zandford was represented on appeal by counsel. Further review of the record indicates that James M. Callender, Jr., entered an appearance the day after the judgment was entered, and that Zandford appeared *pro se* on brief. Zandford was represented by Callender on remand—both on brief and at oral argument, until he moved this Court to appear *pro se*.

tial Bache, his former employer, of three (3) Form U–5s—Termination Notices for Securities Industry—in April of 1984 stating that Zandford was terminated for cause. PB accused Zandford of, *inter alia*, intercepting client confirmations and depositing personal funds into clients' accounts without authorization. [4th amend. compl., ¶¶ 24, 30]. Zandford concedes that "NASD's regulations require the filing of a Form U–5 upon termination of an associated person by a member firm. The form U–5 contains all the relevant information regarding the employee's termination" [*id.*, ¶ 140], and "[o]nce this form is filed and indicates that an employee was terminated for cause, the NASD *must* investigate" [pl's supp. opp. at 8 (emphasis in original) ]. NASD requires brokerage firms to file the Form U–5s to flag rogue traders to the public and to the industry.

The defendant National Association of Securities Dealers [NASD] is a securities association registered pursuant to the Maloney Act, 15 U.S.C. § 78o–3, *et seq.*, which seeks to "provide industry self-regulation of the over-the-counter securities market, subject to government oversight." *Ross v. Bolton*, 106 F.R.D. 22, 24 n. 1 (S.D.N.Y.1985); *accord Austin Municipal Securities, Inc. v. NASD*, 757 F.2d 676, 679–680 (5th Cir.1985). The NASD is divided into 11 "geographic districts," with each district governed by a "District Committee," which is made up "members elected locally in each region by NASD members." [NASD Code of Procedure, pl's supp. opp., exh. 1 at 6 (hereinafter referred to as "NASD Code at __") ]. "When considering disciplinary matters, a District Committee sits as a DBCC [District Business Conduct Committee], the primary local enforcement arm of the NASD." [*Id.* at 6–7]. The DBCCs "meet in each district, and enforce member compliance with: 1) NASD By–Laws and Rules of Fair Practice, 2) federal securities laws and rules promulgated thereunder, 3) the Municipal Securities Rulemaking Board (MSRB) rules, and 4) other applicable securities regulations." [*Id.* at 7].

"Empowered by the [NASD] Board of Governors, each individual District Committee ... is the first step in the NASD's disciplinary process." [*Id.*]. The DBCCs are made up of members of the securities industry who, like voluntary members of bar disciplinary committees, volunteer their services to police the member firms and registered representatives of the self-regulated securities industry. *Austin*, 757 F.2d at 690. The District Committee "staff" serve as the NASD arm that investigates the Form U–5s. [NASD Code at 7].

Defendant Brian A. Hobbs was the Assistant Director of NASD's District No. 10 office in Washington, DC, and defendant Roger B. Sherman was the prosecuting attorney on behalf of NASD during the October 4, 1988 hearing on the administrative complaint filed by the DBCC in 1987. [Defs' supp. brief at 5]. Both Hobbs and Sherman investigated Zandford for the DBCC prior to DBCC's issuance of the administrative complaint against the plaintiff. Their investigation was instigated by the filing of the original three Form U–5s by Prudential Bache, the securities firm that terminated Zandford for cause. [Pl's supp. opp. at 5].

Zandford began his employment with alleged-conspirator Prudential Bache in April of 1983, when PB opened an office in Annapolis. Upon accepting employment with PB, Zandford received a $66,000 bonus. [1/31/89 DBCC decision, defs' mot., exh. 3 at 10 (citations to hearing transcript omitted) ]. As a registered representative selling securities in Annapolis, Zandford voluntarily subjected himself to the disciplinary authority of the NASD District No. 10. [4th amend. compl., ¶ 13].

During the NASD investigative period, civil actions by Zandford's clients against Prudential Bach and Zandford, and cross claims between Zandford and Prudential Bache were being litigated and arbitrated in the Maryland courts and by the New York Stock Exchange. [*Id.*, ¶ 34]. PB negotiated a settlement with Zandford's clients as a consequence of which Zandford incurred nò liability. [*Id.*, ¶ 27]. PB and Zandford settled their cross claims on November 25, 1986. [*Id.*, ¶ 34]. As part of the settlement between PB and Zandford, PB was to file an amended Form U–5 that stated:

'Zandford deposited his personal funds in three (3) clients' accounts. With one ac-

count there were two deposits. One deposit was to meet a margin call, the other deposit was at the client's direction and the client reimbursed the funds to Zandford. With the other two clients, he deposited money in their accounts after he was directed to do so by the clients. All of the foregoing was done with the knowledge and assistance of [Prudential Bache] operations personnel.'

[*Id.*, ¶ 35]. Although the amended U-5 was to be filed within 30 days, it was not filed until just before the DBCC filed its complaint against Zandford. [Pl's supp. opp. at 5]. Nevertheless, Zandford provided Sherman and Hobbs with a copy of the settlement agreement, which contained the amended language in March 1987 before the DBCC issued the complaint. [4th amend. compl., ¶¶ 98–99, 147].

"Hobbs and Sherman prepared an investigative report. This report was presented to the District 10 DBCC on March 26, 1987. Acting on the investigative report filed by the defendants, the DBCC, on April 29, 1987, filed an administrative complaint against Mr. Zandford." [Pl's supp. opp. at 6]. The complaint alleged that Zandford engaged in excessive trading of his client's accounts (three counts) and that he improperly deposited his own funds into customer accounts (one count). [DBCC Complaint, defs' mot., exh. 1].

"The DBCC . . . acts as both the 'prosecutor' and 'adjudicator' in the disciplinary proceedings." *Austin,* 757 F.2d at 681. After the DBCC issued its complaint on April 29, its members removed their prosecutorial hats and donned those of adjudicators. And, at Zandford's request pursuant to NASD self-regulatory procedure, the DBCC held a hearing on the complaint on October 4, 1988, at which defendant Sherman argued the case for NASD. [Pl's supp. opp. at 6].

On June 17, 1987, after the filing of the complaint by the DBCC and before the DBCC October 4 hearing, PB sent to Roberta Donohue of NASD "copies of all trade confirmations which the [PB] branch was able to locate;" this production had been delayed due to the "age of these records." [4th amend. compl., ¶¶ 57, 107].

Zandford, who was represented by counsel at the October 4 hearing, testified and presented four character witnesses. His counsel was permitted to cross examine the witnesses called by Sherman. [DBCC decision at 1].

On January 31, 1989, the DBCC issued its findings, concluding that Zandford was liable on three of four violations named in the complaint. The DBCC censured Zandford, levied a fine of $5,000 and assessed $794.15 in costs. [*Id.* at 16]. Zandford's former PB Branch Manager, John F. Lukas, also named in the complaint on one count of failure to supervise,[3] did not appear and declined to testify by telephone, but did submit an answer and an additional response dated September 25, 1988, presumably in his defense. [*Id.* at 1–2] He, too, was censured, fined and assessed costs. [*Id.* at 16].

On March 6, 1989, Zandford's counsel for the disciplinary proceeding, Stephen R. Becker, sent a letter to Jacqueline Whelan, NASD General Counsel, asking her to obtain certain records from PB, including the tickets that were sent by PB on June 17.[4] [Pl's supp. opp., exh. 4]. Becker asserted in the March 6 request letter that,

> These records will go to show that the Committee improperly attributed in its Modified Looper Formula several transactions to Mr. Zandford which were not, in fact, initiated or entered by him. The factual determinations predicating the Committee's conclusion of excessive trading are therefore erroneous. As the rec-

---

**3.** · *See* DBCC Complaint, defs' orig. mot., exh. 1.

**4.** Zandford's counsel sought: "1. All order tickets entered by or accountable to Mr. Zandford for the period February 15, 1984 through March 15, 1984; 2. All order tickets entered by Mr. Zandford for orders entered on behalf of Mrs. Nevissi, Mr. Kalali, and Mr. Gouhari for the period June 1, 1983 through March 15, 1984; 3.

Statements reflecting all margin calls for the accounts for Mrs. Nevissi, Mr. Kalali, and Mr. Gouhari for the period June 1, 1983 through March 15, 1984; 4. All checks reflecting payment of commissions to Mr. Zandford, including all earnings statements, for commissions earned by Mr. Zandford during the months of February and March 1984." [Pl's supp. opp., exh. 4].

ord reflects, Mr. Zandford's testimony that he was not present at Prudential–Bache to place orders for the latter half of February was countered by John Graner's allegation that Zandford was not suspended until March 1, 1984. Mr. Graner's testimony was both a surprise and unfounded. Crediting Graner's testimony, and viewing it together with other circumstantial evidence, the Committee concluded that Mr. Zandford was present through March 1 and attributed all trades to him for the three clients in question. The requested records will go to show that Mr. Zandford was not present at Prudential–Bache for the latter half of February 1984, that he did not initiate or execute any trades during that period for the aforementioned clients, and that several of the trades incorporated in the Modified Looper Formula were either automatically executed (calls, etc.) or were executed by an individual other than Mr. Zandford. The need for these records results from John Graner's erroneous testimony, which was indeed a surprise at the hearing below, and from the Committee's reliance thereupon in reaching its conclusion that the trades were to be attributed to Mr. Zandford. [*Id.*].

Zandford appealed the DBCC decision to the NASD Board of Governors. Following a hearing before a Subcommittee of the National Business Conduct Committee [NBCC][5] all but one count of the complaint were dismissed. During the March 31, 1989 Subcommittee hearing, Zandford's counsel, Becker (who was joined by co-counsel Richard T. Sampson and John L. Seibel), informed the Subcommittee that he had "requested documents from Prudential–Bache, the firm that Mr. Zandford worked at at [sic] the time these allegations arose, and Ms. Whelen [NASD General Counsel] has informed [counsel] that Prudential–Bach has not yet compiled or sent those documents but that she is willing to keep the record open

and give us two weeks after we receive those documents." [Subcommittee tr. at 9]. Ms. Whelan, who was appearing on behalf of NASD at the review,[6] added, "I have gotten a representation, by the way, from the person at Pru–Bache I have been dealing with that he expects to provide me with those documents, to the extent that they can be located within the firm, by April 7th. And they will be made available to the panel by overnight mail or by fax, depending upon the bulk, and to you as soon as I get them." [*Id.*]

"At the Subcommittee hearing, Zandford introduced into the record copies of the schedules of transactions in the accounts … annotated to reflect Zandford's contention that certain of the transactions on the schedules should not have been included in the Looper analysis because they were unsolicited or occurred after he was no longer in the office … [He] .. argued emphatically that he was no longer in the office after the first week in February and did not effect the transactions occurring during those weeks … and testified that he received no compensation from Pru Bache for any transactions effected after January." [Bd of Gov. 6/7/89 decision, defs' mot., exh. 4 at 6].

On May 5, 1989, about one month before the NASD Board of Governors issued its decision, Becker sent another letter to Whelan suggesting,

[i]t has been a while since we had discussed Prudential–Bache's compliance with the NASD request for information in this matter. I assume from the lack of correspondence over the last few weeks that Prudential–Bache has failed to comply with the request for information. Accordingly, I request that you submit this matter to the Board of Governors, giving Mr. Zandford's testimony at his hearing on March 31 presumptive weight.

As you will recall, Mr. Zandford testified that he was suspended by Lukas and was

---

**5.** The Subcommittee of the NBCC, composed of current and former Governors of the NASD, reports to the NBCC, which in turn makes a recommendation to the NASD Board of Governors. [NASD Code at 6, 23; Subcommittee tr., pl's supp. opp., exh. 6 at 5B].

**6.** Sherman served as co-counsel; however, by this date, he was no longer the regional attorney for District 10. [Subcommittee tr. at 3]

not present at Prudential–Bache from mid-February 1984 until his official termination on March 15, 1984. This is buttressed by Lukas' letter contained in Exhibit 5 to the original proceedings. Any testimony to the contrary is totally unsupported, especially in light of Prudential–Bache's failure to produce documents which would specifically address this issue. This, in turn, renders the modified Looper formula analysis undertaken by the NASD staff unreliable since its conclusion relies in part on the assumption that the February transactions are all attributable to Mr. Zandford.

\*\*\*

Mr. Zandford was victimized by allegations of misconduct asserted by Jack Graner and by his reliance upon the authorities at Prudential–Bache who condoned the actions later asserted by the company to be wrongful.

[Pl's supp. opp., exh. 5].

The NASD Board found, on June 7, 1989, that "[w]hen the schedules are adjusted to reflect the omission of stock dividends, errors, those transactions that we believe to have been unsolicited, and those that occurred after the time that Zandford was no longer in the office, the resulting activity in the accounts simply does not, in [the Board's] view, amount to excessive trading. In a down market, it is not uncommon for a speculative account seeking the highest rate of return to turn over with perhaps greater than average frequency due, for example, to such strategies as the averaging down that occurred in the RK and PG accounts." [6/7/89 Bd of Gov. decision at 7]. The NASD Board upheld the censure and the imposition of costs, and it reduced the fine by $3,000. The NASD noted "[t]he District Committee did conclude that Zandford was responsible for all of the transactions effected in the account through the end of February, notwithstanding his assertions that he was no longer at the firm after the first week of the month. They based this determination on Graner's testimony, Lukas' assertions that he had not 'suspended' Zandford, a purchase at the end of February in FN's account of MCI, a stock that Zandford had purchased previously for her, and the February accounts for

each customer listing Zandford as the account executive." [*Id.* at 5].

Zandford, still represented by Becker, then appealed the NASD Board decision to the Securities and Exchange Commission, which, on November 5, 1991, "[s]et [ ] aside the disciplinary action taken by registered securities association." [11/8/91 SEC order, defs' mot., exh. 5].

On June 23, 1993, the plaintiff filed the case at bar.

### C. Absolute Immunity

■ The concept of absolute immunity of quasi-judicial officers such as prosecuting attorneys was endorsed by the Supreme Court 71 years ago when it affirmed the Second Circuit's decision in *Yaselli v. Goff,* 12 F.2d 396 (2d Cir.1926), *aff'd per curiam,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927). The Second Circuit found that prosecuting attorneys were immune from suit for malicious prosecution, notwithstanding the prosecutors' malice or wilfulness. *See Imbler v. Pachtman,* 424 U.S. 409, 421—422, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (discussing *Yaselli,* and noting the theory of absolute immunity has existed since 1896). Today, it remains beyond dispute that prosecutors are entitled to absolute immunity from suits for damages arising from activities that are "intimately associated" with a judicial proceeding. *Id.* at 430–431, 96 S.Ct. 984.

The Court of Appeals, fearing that this Court extended absolute prosecutorial immunity "with too broad a stroke" to the self-regulatory NASD and its staff, remanded this civil action for further consideration in light of *Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), which held that acts that are purely investigatory are not entitled to absolute immunity, and *Austin Municipal Securities, Inc. v. NASD, supra,* which held "that the National Association of Securities Dealers, Inc ... and its disciplinary officers have absolute immunity from further prosecution for personal liability on claims arising within the scope of their official duties." 757 F.2d at 679.

■ An individual to whom absolute prosecutorial immunity attaches may not always

carry a name tag or calling card identifying herself as the "prosecutor", and a person who carries a prosecutor badge may not always be entitled to absolute immunity for his actions. *See Buckley*, 509 U.S. at 273, 113 S.Ct. 2606 ("[A]s the function test of *Imbler* recognizes, the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor."). The Supreme Court has admonished lower courts to pay attention not to job classifications, but to "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate" when determining whether absolute immunity should preclude civil liability. *Kalina v. Fletcher*, 522 U.S. 118, 118 S.Ct. 502, 507, 139 L.Ed.2d 471 (1997) (quoting *Imbler*, 424 U.S. at 430–431, 96 S.Ct. 984).

█ Thus, the task of this Court is to define the official scope of Hobbs' and Sherman's prosecutorial roles pursuant to the NASD self-regulatory scheme without regard to their respective titles or the terminology found in the NASD Code of Procedure (attached as exhibit 1 to the Zandford's supplemental opposition). The absolute immunity doctrine is *flexible*, "call[ing] upon the court to weigh such factors as the status of the defendant, the nature of the alleged acts and, above all, the utility of a grant of immunity."

*Simons v. Bellinger*, 643 F.2d 774, 777 (D.C.Cir.1980).

*Imbler* did not define the "outer limits" of a prosecutor's absolute immunity, it only acknowledged that some official duties would not fall within the gambit. *Kalina*, 522 U.S. at ——, 118 S.Ct. at 507. Pursuant to tripartite test articulated in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), which was decided by the Supreme Court two years after *Imbler* and which involved non-traditional officials in quasi-judicial roles as we have here with the NASD, this Court is to review the nature of Hobbs' and Sherman's activities—whether the activities share the characteristics of the judicial process in an regulatory framework that controls unconstitutional conduct and whether recriminatory lawsuits are a likely result—to determine whether they are absolutely immune from civil prosecution.

Although each case and the actions of each actor must be looked at individually without regard to an individual's title, the Court need not reinvent the wheel with respect to the scope of official advocatory duties for which prosecutors, and in particular NASD prosecutors, are generally granted immunity. *Austin, supra*, sets forth specific guidelines for immunity in an action such as this one brought by *Zandford*,[7] and it is supplemented by a case from this Circuit's Court of

---

7. Unlike Zandford, however, Austin did not follow the appropriate administrative appellate channels; rather, Austin filed its civil action alleging, *inter alia*, deprivation of procedural due process, of liberty without due process, and of property, conspiracy, malicious prosecution and interference with business relations. *See Austin*, 757 F.2d at 684. The NASD and its officers then moved for summary· judgment premised upon, *inter alia*, absolute immunity from suits for actions connected to their official duties. The District Court denied the motion, and the interlocutory appeal followed. Here, the NASD defendants continue to assert that the plaintiff failed to exhaust his administrative remedies. In *Austin*, the Fifth Circuit found (and the NASD admitted) that the malicious prosecution, due process, and antitrust claims were not arbitrable, but that the defamation and interference with business relations were "under the terms of the NASD arbitration clause contained in the membership agreement ... [which] provides that 'any dispute, claim or controversy arising out of or in connection with the business of any member ... (1) between or among members; (2)

between or among members and public customers or others ...' is subject to arbitration ... [and] extends to disputes involving persons associated with a member." *Austin*, 757 F.2d at 696 (citations to NASD manual omitted). The Fifth Circuit acknowledged that "[t]he arbitration clause is ambiguous," but that it "arguably covers" a dispute between a member and the NASD itself, and that it should be liberally construed in favor of arbitration. *Id.* at 696–697 (citations omitted). In light of the Fifth Circuit's analysis in Austin, the Maryland District Court's ruling in the somewhat related case against PB (*see supra* n. 1), and the fact that Zandford grounds his claims for relief on violations and abuses of the NASD self-regulatory scheme, it appears the Zandford should have pursued administratively the conspiracy and interference with contractual relations claims. Since, however, the Court concludes that the defendants are immune from prosecution, that the statutes of limitations have run on all of Zandford's claims, and the defendants are entitled to a judgment as a matter of law, it has no case to stay pending arbitration.

Appeals, *Simons v. Bellinger, supra*, which involves a self-regulatory bar . committee whose function was used as a comparison to that of NASD by the Fifth Circuit in *Austin.* See 757 F.2d at 690.

### 1. *Austin Municipal Securities, Inc. v. NASD,* 757 F.2d 676 (5th Cir.1985)

The Court shall begin with the teachings of the Fifth Circuit in *Austin.* Austin Municipal Securities brought a civil action against NASD, the District Director, the NASD investigator, and the members of the DBCC. On interlocutory appeal, the Fifth Circuit, recognizing that "[s]ome official positions . . . require greater protection than qualified immunity provides," but that "[a]ll conduct of officials is not immune," found the activities of the DBCC, which by regulation both prosecutes and adjudicates complaints against NASD members, fell within the category of prosecutorial functions for which absolute immunity attaches. 757 F.2d at 681, 687. The Court did not address the immunity of the District Director or the investigator; it remanded their fate for further consideration by the district court. *See infra* at 17.

▮ Pursuant to the congressionally approved self-regulatory scheme, private citizens work in quasi-governmental capacities for the NASD. In defining the appropriate scope of official authority for which the NASD quasi-judicial officers are entitled to absolute immunity, the Fifth Circuit examined the behavior of the NASD officials to determine if they "possessed discretionary authority." *Austin,* 757 F.2d at 688 (citation omitted). An individual in a quasi-judicial role whose actions "arguably fall within the range of permissible actions" is protected by absolute immunity. *Id.* at 688. A quasi-judicial officer, however, who ordinarily would be protected by absolute immunity loses that protection when his or her conduct is undertaken outside the scope of his or her authority. *Briggs v. Goodwin,* 569 F.2d 10, 15 & n. 5 (D.C.Cir.1977), *reh'g granted and opinion vacated on other grounds,* 712 F.2d 1444 (D.C.Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984) (finding that a U.S. Department of Justice prosecutor serving in an investigator capacity who committed perjury has undertaken "an

activity beyond the scope of his authority, in clear violation of the law and far removed from the discretionary areas of judicial process traditionally protected by the quasi-judicial immunity doctrine"). Our Court of Appeals has found "that a broad interpretation of jurisdiction is necessary to guarantee a genuine benefit from the grant of immunity," and that "an act is within the official's jurisdiction if it is not 'manifestly or palpably beyond his authority.' " *Simons,* 643 F.2d at 786 (citing *Briggs I,* 569 F.2d at 15, and quoting *Spalding v. Vilas,* 161 U.S. 483, 498, 16 S.Ct. 631, 40 L.Ed. 780 (1896)).

Before concluding that absolute immunity attaches to quasi-judicial officers of the NASD, the Fifth Circuit looked to the "constitutional, congressional, and historical guidance, and . . . the immunity historically accorded analogous officials at common law," noting that the Supreme Court, in *Butz v. Economou,* granted absolute immunity to administrative officials who were performing functions similar to that of judges and prosecutors. *Austin,* 757 F.2d at 688. The Court then evaluated the NASD's activities according to the tripartite function analysis enunciated in *Butz:* whether "a) the official's functions share the characteristics of the judicial process; b) the official's activities are likely to result in recriminatory lawsuits by disappointed parties; and c) sufficient safeguards exist in the regulatory framework to control unconstitutional conduct"; it concluded that all three were met and thus the NASD officials before them were entitled to absolute immunity. *Id.* (citing *Butz,* 438 U.S. at 510–513, 98 S.Ct. 2894).

*Austin* acknowledged that "[m]embers of the NASD staff [such as Hobbs and Sherman] assist the DBCC by performing investigative work, but the DBCC determines whether to prosecute a member or associate." *Austin,* 757 F.2d at 681. But the Fifth Circuit never addressed whether the prosecutorial/investigatory assistance provided to the DBCC by staff such as Hobbs and Sherman is entitled to absolute immunity. Instead, the Fifth Circuit remanded the issue and admonished the trial court that the Fifth Circuit

has stated that prosecutorial immunity extends to actions that are a necessary and integral part of a prosecutor's role in the judicial system ... Thus, ... actions in initiating and pursuing a prosecution and in presenting the prosecutor's case warrant prosecutorial immunity... Immunity also extends to filing complaints, instituting arrest or search proceedings, and drawing indictments or informations.

*Id.* at 689 (internal quotations and citations omitted). The *Austin* court added that "[f]or any actions the *staff* has taken in a prosecutorial role ... its members would be entitled to receive absolute immunity based on the same analysis as set out for the DBCC members." *Id.* at 693 (emphasis added).

With *Austin* as a backdrop, this Court must sift through the various allegations of misconduct against staff members Hobbs and Sherman and determine whether such actions of the NASD staff members are functionally equivalent to a prosecutorial counterpart and, pursuant to the *Butz* tripartite test, whether they are entitled to absolute immunity. The parties are not disputing that NASD, which is a defendant pursuant to the principle of *respondeat superior* [4th amend. compl., ¶¶ 80, 92, 129, 137, 155, 162], is absolutely immune for the activities for which its staff are absolutely immune, and the Court concurs. *Accord Austin*, 757 F.2d at 692.

### 2. *Butz v. Economou* Tripartite Function Test

"*Butz* demands that both the allegations against the defendant[s] and the precise nature of the defendant[s'] work be examined in light of the three factors," *Simons*, 643 F.2d at 779: whether

a) the official's functions share the characteristics of the judicial process

b) the official's activities are likely to result in recriminatory lawsuits by disappointed parties; and

c) sufficient safeguards exist in the regulatory framework to control unconstitutional conduct.

The Court of Appeals for this Circuit has admonished "that prosecutorial conduct must be evaluated independently on the facts of each case to determine the measure of immu-

nity which the conduct deserves." *Briggs*, 569 F.2d at 23 n. 10 (dismissing a "mechanical" argument that, simply because the alleged perjury by the defendant occurred in a courtroom before a grand jury, it is "intimately associated with the judicial process" and thus the quasi-judicial officer is absolutely immune.) The focus is on the disputed behavior itself.

The timing of the judicial, or quasi-judicial as we have here, officer's "prosecutorial action, by itself, is not dispositive of the immunity issue" as an advocate's role can "entail certain 'actions preliminary to the initiation of a prosecution and actions apart from the courtroom.'" *Id.* at 23 (quoting *Imbler*, 424 U.S. at 431 n. 33, 96 S.Ct. 984). And, the inverse is true as well; "the investigative function may embrace some acts even when performed after the commencement of judicial proceedings" that would not be entitled to absolute immunity. *Id.*

Zandford alleges that Hobbs and Sherman (1) failed to name PB as a respondent [4th amend. compl., ¶ 28]; (2) "ignored the truth, as well as the findings of two attorneys' investigation and their offer to provide them with the relevant documents ... [and] [i]nstead ... proceeded to *prosecute* Zandford based on unfounded and unproven allegations" [*id.*, ¶¶ 38,124 (emphasis added) ]; (3) conspired with PB and its agent/employee Graner to illicit his perjured testimony during the October 4, 1988 DBCC hearing and thus interfering with the PB (Graner)—Zandford settlement agreement [*id.*, ¶¶ 41–42, 147]; (4) concealed and fabricated material evidence to accommodate Graner's concocted and perjured testimony [*id.*, ¶¶ 43, 110]; (5) intentionally and maliciously concealed the trade confirmations from their evidence against Zandford (which were received in June 1987 after the complaint had been issued by the DBCC) [*id.*, ¶¶ 57–58, 109]; (6) altered the evidence and attributed fabricated statements in the DBCC's decision to a respondent who did not appear, but instead addressed two letters to the DBCC [*id.*, ¶¶ 62–63, 121]; (7) provided confidential documents to Graner to prepare him for his testimony with the understanding that the documents would remain confiden-

tial [*id.*, ¶ 65]; and (8) the DBCC "filed its complaint against Zandford on April 29, 1987, based on unfounded allegations instigated by PB, which Hobbs and Sherman could have and should have verified in the normal course of any investigation, and as part of their official duties" [*id.*, ¶ 45 [8]]. The Court must review all of these allegations pursuant to the *Butz* tripartite test.

### (a) *Butz* factor no. 1: Hobbs' and Sherman's functions share the characteristics of the judicial process

What do we know about Hobbs's and Sherman's functions? We know Hobbs and Sherman were engaged in preparations to present a case before the quasi-grand jury, the DBCC, which is a critical phase of any prosecution. Here, the DBCC served not as an investigative grand jury, as the investigation was essentially completed before the DBCC convened, but as a "deliberative body" deciding whether to issue a complaint against Zandford based on the evidence gathered and presented. *See Briggs*, 569 F.2d at 24 (drawing distinctions between the dual roles a grand jury may play); *see also Moore*, 65 F.3d at 194 (noting the *Buckley* Court's distinction between the two purposes a grand jury may serve).

We know that district staff such as Hobbs and Sherman "report to the DBCC ... regarding member compliance with" the NASD rules and regulations; staff such as Hobbs and Sherman also "collect[ ] information through various examination and surveillance programs so that a DBCC ... can determine whether violations may have or have not occurred." [NASD Code at 7].

The NASD Code of Procedure states that:
The role of the NASD staff is purely investigative; with the decision to take any disciplinary action resting solely with the DBCC.

[*Id.* at 8]. The first complete thought in the above-noted compound sentence forms the basis for Zandford's entire argument. *See* Pl's supp. opp. at 8 ("The role of the NASD staff is 'purely investigative.'") Zandford

fails to acknowledge the second sentence in this description of the DBCC disciplinary process—that the final *decision* to take disciplinary action is with the DBCC. The DBCC cannot reach such a decision without the investigative assistance of the *staff*. Similarly, a grand jury cannot indict an accused without the prosecutor first investigating and presenting the case to the grand jury. Thus, the sentence in the NASD Code of Procedure simply draws a distinction between the DBCC role in handing out the complaint and punishment, and that of the paid staff. The sentence does not lessen the prosecutorial role of the *staff*—particularly in light of the Supreme Court's directive in *Butz* for lower courts to disregard titles and look to the function of the disputed action.

As noted *supra* at 5, the DBCC is made up of elected members of the securities industry who serve voluntarily and who continue their securities business during business hours. The staff, on the other hand, are employees of the NASD, not competitors of the respondent—hence the word *staff*. Just as carrying the title *prosecutor* does not entitle an individual to absolute immunity for all actions undertaken, being labeled a *staff* person, as the Supreme Court and our Court of Appeals have made abundantly clear, does not determine the staff member's immunity or lack thereof. The Court must look to the actions undertaken by the individual and under what authority the actions were taken.

As *Austin* explains, the DBCCs serve dual roles—prosecutorial and adjudicatory. The DBCC served in both capacities in the underlying disciplinary action against Zandford. In its prosecutorial role, the fundamental equivalent of what the DBCC does is serve as a grand jury issuing an indictment. The DBCC "review[s] examination and investigation reports submitted by NASD staff in their respective districts or departments" and "initiate[s] or authorize[s] complaints against firms or associated persons alleged to have violated NASD rules or other rules over which the NASD has jurisdiction". [NASD Code at 8]. If the prosecutor—the NASD staff person presenting the

---

8. Zandford's Fourth Amended Complaint is misnumbered, containing two paragraphs numbered

45. The Court is referencing the second paragraph no. 45 that begins on page 8.

case to the DBCC quasi-grand jury is successful in having an indictment returned, then he prosecutes the case before the DBCC, which serves in a panel-of-judges-like capacity, "conduct[ing] disciplinary proceedings in accordance with the NASD's Code of Procedure" [*id.*], which, as the Fifth Circuit has concluded, provides adequate safeguards to protect the rights of the accused. *See Austin,* 757 F.2d at 689 ("[T]he statutory framework of the NASD disciplinary process contains sufficient safeguards to control unconstitutional conduct.").

"After a DBCC ... renders a decision and determines the sanctions—if any—to be imposed, the NASD staff prepares a written decision on behalf of the DBCC ... and forwards it to the respondent." [NASD Code at 19]. The functional equivalent of this action by NASD *staff* would be that of a judge's law clerk drafting an opinion pursuant to the judge's findings. Law clerks are entitled to absolute immunity for such actions, as is the NASD staff because the judge and the DBCC have absolute immunity for their adjudicatory roles. *Gray v. Bell,* 712 F.2d 490, 497 n. 15 (D.C.Cir.1983) *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984) (quoting Casto, Innovations in the Defense of Official Immunity Under Section 1983, 47 TENN.L.REV. 47, 84 n. 182 (1979) ("a judge's law clerk should receive the same immunity as the judge")); *accord Oliva v. Heller,* 839 F.2d 37, 39 (2d Cir.1988).

The role of the *staff* as the prosecutors continues through the appellate process in which Zandford engaged very successfully: "NBCC hearing panels convene approximately every two months in various locations across the nation. Appellate hearings consist of 30 minutes of oral argument by each respondent, and 30 minutes of oral argument by NASD *staff* (typically the regional attorney who presented a case to the DBCC)." [NASD Code at 23 (emphasis added)].

In fact, despite Zandford's relegation of the staff to *only* outside of the disciplinary prosecutorial process, the *staff* plays a significant prosecutorial role from the presentment of evidence before the DBCC through the multiple layers of appellate review, according

to the same NASD Code on which Zandford relies. For example, at the DBCC hearing, "[e]vidence of mitigating circumstances may be presented by the respondent and evidence relevant to sanctions may be presented by the *staff*" in its prosecutorial role. [*Id.* at 13 (emphasis added)]. Moreover, "[i]n the hearing process, the *staff* (generally an NASD attorney from ... a District [like Sherman]) presents the evidence that is relevant to the allegations in the complaint. The *staff* ensures that the record is as complete as possible to help the full DBCC ... or NBCC reach an informed decision. Respondents are nevertheless obligated to present all evidence in their defense, since such material may not be added to the record on appeal in the absence of exceptional circumstances." [*Id.* at 18]. With respect to respondent Zandford, that obligation included presenting the "compelling" relevant document evidence that Zandford's counsel "offer[ed] to provide" Hobbs and Sherman prior to the DBCC complaint, regardless whether Hobbs and Sherman accepted the offer. [4th amend. compl., ¶ 38]. Zandford disputes that staff members Hobbs and Sherman made the record as complete as possible, but they nevertheless would be immune from prosecution for failing to do so as the presentment of evidence is intimately associated with the judicial process and thus absolute immunity attaches.

The real question for the Court then is, when did Hobbs' and Sherman's prosecutorial immunity first attach? The Supreme Court, in *Imbler,* recognized

> that the duties of the prosecutor in his role as advocate ... involve actions preliminary to the initiation of a prosecution and action apart from the courtroom. A prosecuting attorney is required constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. Preparation, both for the initiation of the criminal process and for a

trial, may require the obtaining, reviewing, and evaluating of evidence.

424 U.S. at 431 n. 33, 96 S.Ct. 984. Although the *Imbler* Court had no occasion to "draw[ ] a proper line between" administrative and investigative actions on the part of the prosecutor [*id.*], the Court of Appeals for this Circuit has interpreted *Imbler* to mean that "even when a prosecutor acts outside the courtroom, in territory more commonly patrolled by investigative officers, he may, on occasion, still benefit from a grant of absolute immunity." *Simons*, 643 F.2d at 780 (citing *Imbler*, 424 U.S. at 431 n. 33, 96 S.Ct. 984).

Here, the Court concludes that Sherman and Hobbs were the prosecutors who, acting in a prosecutorial fashion, prepared the case for the DBCC grand jury from the moment the original three (3) Form U–5s were filed. Hobbs and Sherman were *not* assigned as general investigators involved in a broad-scale investigation of illegal activity. As prosecutors, they marshaled and reviewed all of the evidence and decided what evidence to present to the DBCC grand jury and then to the DBCC in its dual adjudicatory role. They decided whether to seek a complaint against employees of PB other than Lukas, and whether to seek a complaint against PB itself. Throughout the "investigation", Hobbs and Sherman retained discretion to refer the case to the District Director for informal remedial action if they concluded the violations involved only a minor or technical violation. [NASD Code at 8, 9–10].

The Court's conclusion is supported by drawing analogies with the functions of the Bar Disciplinary Committee as explained by this Circuit in *Simons v. Bellinger*, and which also guided the Fifth Circuit's opinion in *Austin*. The Bar Committee's interaction with the Simonses was similar to Hobbs' and Sherman's dealings with Zandford: The investigations of both "were certainly directed toward a determination of whether the initiation of formal proceedings would be appropriate ... [Hobbs and Sherman and the NASD] had passed beyond a mere search for the signs of illegal conduct and even beyond an investigation for the perpetrators of that conduct. From their first contact with [Zandford, pursuant to the three Form U–5s

stating Zandford had been dismissed for cause, Hobbs and Sherman] had already established a *prima facie* case ... [Hobbs' and Sherman's evidence gathering] were all part of [their] attempt to determine whether or not [Zandford's] apparent violation warranted a formal prosecution. The decision of whether or not to prosecute is well-recognized as a determination which is comparable to judicial decisionmaking and which also requires the full protection of absolute immunity ... Having genuinely focused upon [a] particular defendant[ ] and a particular wrong, [Hobbs and Sherman are] entitled to absolute immunity when [they] make inquiries necessarily antecedent to [their] determination regarding prosecution ... [Hobbs and Sherman] were, in reality, advocates preparing for a particular lawsuit." *Simons*, 643 F.2d at 780.

As was the Committee's actions in *Simons*, Hobbs' and Sherman's "activities were sufficiently focused upon a particular proceeding so that they were not serving as mere investigators." *Simons*, 643 F.2d at 785. Upon PB's filing of the three Form U–5s, Hobbs and Sherman had a *prima facie* case; thus, Hobbs' and Sherman's *investigation* had "passed beyond the stage where mere police work was needed." *Id.* at 780 n. 6. Hobbs and Sherman were preparing a case for a grand jury and then for trial, though they retained the discretion to refer it to the NASD District Director for informal remedial action if the investigation revealed only "minor or technical violations by members" [NASD Code at 8, 9–10], therefore, absolute immunity attached. The scenario presented here is a perfect illustration for the *Butz* Court's admonishment to the lower courts to look beyond the titles and formalities of the judicial process to the true nature of the actions.

Moreover, just as a court may not grant immunity to a prosecutor for actions for which an investigator would not be immune, the Court also cannot selectively grant the DBCC immunity and offer no immunity to their staff investigatory arm. The members of the DBCC sit voluntarily; they continue their day jobs in the securities industry and thus provide the expertise necessary to fairly

judge disciplinary matters. Once the investigation becomes sufficiently focused as it has here as a result of the three Form U–5s, the DBCC *staff* serve as the eyes and ears of the DBCC members who themselves, as voluntary members, are not in a position to investigate. Moreover, having non-competing paid staff *v.* a competitor in the industry do the investigation is likely to result in a much fairer disciplinary proceeding.

Having established when prosecutorial immunity attached, the Court will now turn to Zandford's eight allegations of misconduct on the part of Hobbs and Sherman (*supra* at 18–19):

■ Zandford complains that Hobbs and Sherman dismissed PB from the complaint [4th amend. compl., ¶ 40], while in the next breath conceding that neither Hobbs nor Sherman issued the complaint, but rather the NASD [DBCC] did. [*Id.,* ¶ 45]. The NASD Code of Procedure on which Zandford relies clearly states that only the DBCC can issue a complaint. [NASD Code at 8]. This Court, like the Fifth Circuit in *Austin,* concludes that the role of the quasi-grand jury DBCC in issuing a complaint is prosecutorial, and thus the DBCC is entitled to absolute immunity (no. 8 above). With respect to Zandford's complaint that Hobbs and Sherman did not ask the quasi-grand jury DBCC to issue a complaint against PB (no. 1 above), a determination of who to prosecute, like the a prosecutor's role in presenting the evidence to the quasi-grand jury DBCC (no. 2 above) is prosecutorial and, accordingly, Hobbs and Sherman are entitled to absolute immunity for these actions. *See Imbler,* 424 U.S. at 431 n. 33, 96 S.Ct. 984. ("We recognize that the duties of the prosecutor . . . include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants . . ."); *see also Moore,* 65 F.3d at 194 (quoting *Imbler,* 424 U.S. at 431, 96 S.Ct. 984) ("His prosecutorial immunity also protects [the defendant] from liability for allegedly concealing exculpatory evidence from the grand jury and for allegedly manipulating evidence before the grand jury to create a false impression of what [the plaintiff]

knew about the alleged fraudulent schemes. [The defendant's] decisions regarding what evidence to put before the grand jury, and in what manner, are advocatory because they are central to the prosecutor's task of 'initiating a prosecution' and 'presenting the State's case.' ")

■ Zandford also accuses Hobbs and Sherman of violating *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to reveal to the plaintiff that the NASD possessed the trade confirmation tickets that Zandford claimed would exonerate him (no. 5 above). "[W]ithholding after indictment information that is subject to disclosure under *Brady v. Maryland* . . . is advocatory." *Moore,* 65 F.3d at 194 (citations omitted). Accordingly, Hobbs and Sherman are absolutely immune from prosecution for this act. *See also Imbler,* 424 U.S. at 415, 430, 96 S.Ct. 984 (*criminal* prosecutor alleged to have failed to fully develop exculpatory evidence prior to trial absolutely immune from prosecution as his actions were an integral part of the judicial process (citation and quotations omitted)).

Zandford further accuses Hobbs and Sherman of conspiring with PB Regional Director Graner, and knowingly using his perjured testimony during the October 4, 1988 DBCC hearing, giving Graner confidential documents to prepare Graner's testimony, and concealing and fabricating material evidence to accommodate Graner's perjured testimony (nos. 3, 4 & 7 above). Assuming Hobbs and Sherman committed these inappropriate acts, they all nevertheless occurred when Hobbs and Sherman were serving in the functionally comparable capacity of a prosecutor. Thus, Hobbs and Sherman are absolutely immune from civil liability for the alleged acts. *See Imbler,* 424 U.S. at 415, 430, 96 S.Ct. 984 (prosecutor alleged to have knowingly used false testimony found to be absolutely immune from civil liability).

Finally, Zandford accuses Hobbs and Sherman of altering the record to support their claim (no. 6 above). According to the NASD Code of Procedure submitted by Zandford, "[a]fter a DBCC . . . renders a decision and determines the sanctions—if any—to be imposed, the NASD staff pre-

pares a written decision on behalf of the DBCC ... and forwards it to the respondent." [NASD Code at 19]. Thus, the alterations alleged to have been made were made to the DBCC opinion written by its functionally comparable law clerk—the NASD staff. The law clerk as well as the NASD staff are entitled to absolute immunity because the judge and the DBCC have absolute immunity for their adjudicatory roles. *See Gray, supra,* 712 F.2d at 497 n. 15.

Thus, the Court, faced with the task of drawing the line between actions intimately associated with the judicial process and administrative acts in this particular case, concludes that all of Hobbs' and Sherman's functions share the characteristics of the judicial process.

The plaintiff's argument that Hobbs and Sherman are not entitled to absolute immunity because of the language used in the NASD Code of Procedure designating them as "staff" and "investigators" of the DBCC is not sufficient to overcome the defendants' properly supported motion. Zandford failed to consider the nature of their actions in the self-regulatory disciplinary process, and has not shown that their actions fall outside of the functionally comparable roles of a prosecutor. Again, "[t]he crucial inquiry concerns the nature of the official behavior challenged, not the identity or title of the officer responsible therefor." *Briggs,* 569 F.2d at 21.

### i. Qualified Immunity

■ Even if the Court separates out Hobbs' and Sherman's actions during the investigative period (from 1984–1987) from the entire administrative prosecution and appellate review (through 1991), and accepts Zandford's strict definition of their titles, the Court concludes that Hobbs and Sherman are entitled to judgment as a matter of law. Accepting the rigid application urged by Zandford, the Court finds the investigators were serving in the functionally comparable positions of police officers to whom qualified immunity attaches. *See Simons,* 643 F.2d at 777. As "investigators," Hobbs and Sherman are subject to liability only if they "intentionally violated [Zandford's] constitutional rights." *Austin,* 757 F.2d at 687. Zandford, however, has plead no such wrong that the

officers, if you will, committed in the investigation stage. They gathered evidence, that is not in dispute. [*See* 4th amend. compl., ¶ 37 ("Prior to the NASD's filing of its unjustified complaint, Zandford's attorneys had met with Hobbs and Sherman on *several* occasions, and provided them with factual background of the lawsuits, as well as the circumstances in the Annapolis office, and those leading to Zandford's unlawful suspension and termination.") (emphasis added and omitted) ]. Moreover, Hobbs and Sherman had no choice but to investigate his securities activities in light of the three (3) Form U–5s filed by Prudential Bache indicating that Zandford had been terminated by the securities firm for cause. [Pl's supp. opp. at 5, 8]. Nor were Hobbs and Sherman bound by any sort of settlement agreement outside one approved by the NASD [*see* NASD Code at 12 ]—particularly a settlement agreement that states that the plaintiff "resigned" when the plaintiff himself concedes that he was terminated [*see* 4th amend. compl., ¶¶ 29, 35].

Instead, Zandford's complaint is that, once Hobbs and Sherman donned their prosecutor hats, they failed to provide all of the evidence uncovered in their investigation to the quasi-grand jury DBCC and then the quasi-judicial DBCC, including the information they learned from Zandford and his counsel prior to the issuance of the DBCC complaint, and information received from PB between the issuance of the complaint and the DBCC hearing. Zandford simply fails to acknowledge that Hobbs and Sherman became prosecutors at the very latest in March 1987 when the evidence gathered was presented to the DBCC is its quasi-grand jury capacity. *See Moore,* 65 F.3d at 194 (quoting *Buckley,* 509 U.S. at 273, 113 S.Ct. 2606, "Advocatory conduct protected by absolute immunity 'include[s] the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.' ").

Neither in his Fourth Amended Complaint or in any pleadings the Court considered, has Zandford even suggested "clearly established statutory or constitutional rights of which a reasonable [investigator] would have known"

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), that have been violated by Hobbs and Sherman in their investigatory roles. If, as Zandford suggests, Hobbs and Sherman were merely the functional equivalent of police investigators, they are entitled to qualified immunity. Since Zandford has not plead a constitutional or statutory violation by Hobbs and Sherman in their investigatory role, there is no need to permit discovery prior to dismissing the action based on qualified immunity. As "investigators," they had no constitutional or statutory duty (or at least no such duty that has been brought to the attention of the Court in the form of an allegation by Zandford) to provide the information to anyone other than the prosecutors—*themselves.*

At least by the time Hobbs and Sherman stood, figuratively speaking, in front of the DBCC in its functional comparable role of a grand jury to present evidence in support of a complaint to be issued by the quasi-grand jury DBCC against Zandford they were prosecutors. *Maglione v. Briggs,* 748 F.2d 116, 116 (2nd Cir.1984); *see also Tserpes v. SEC,* 454 F.Supp. 940, 942 (S.D.N.Y.1978) (quoting *Butz, supra,* 438 U.S. at 517, 98 S.Ct. 2894, the activities of "an enforcement attorney with the SEC, in the course of which employment he participated in the investigation of plaintiff's activities in connection with his corporation's issuance of public shares . . . and [the activities of] an enforcement attorney with the SEC, . . . [who] also took part in the litigation against the plaintiff . . . evoke protection of the further *Butz* holding that 'an agency attorney who arranges for the presentation of evidence on the record in the course of an (administrative) adjudication is absolutely immune from suits based on the introduction of such evidence.' ") Thus, Hobbs' and Sherman's actions in failing to present the evidence occurred during the period of time in which Hobbs and Sherman were absolutely immune from prosecution.

**(b)** ***Butz* factor no. 2: Hobbs' and Sherman's activities are likely to result in recriminatory lawsuits by disappointed parties**

" '[I]t is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own conviction, without apprehension of personal consequences to himself.' " *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 337, 20 L.Ed. 646 (1871), quoted in *Briggs I,* 569 F.2d at 15. " 'The office of public prosecutor is one which must be administered with courage and independence. Yet how can this be if the prosecutor is made subject to suit by those whom he accuses and fails to convict?' " *Imbler,* 424 U.S. at 422, 96 S.Ct. 984 (quoting *Pearson v. Reed,* 6 Cal. App.2d 277, 44 P.2d 592, 597 (1935)). This fear, which forms the basis of common law absolute immunity, is particularly true in the self-regulatory securities industry where a member is judged by his or her peers. Though our Forefathers set up our system of justice such that an accused shall be judged by a jury of one's peers, the Congress saw fit to set up through the NASD with SEC supervision a system to protect both the regulators and the public by having the industry and all its expertise self-police the members. *See Austin* 757 F.2d at 680 (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. NASD,* 616 F.2d 1363, 1367 (5th Cir.1980), quoting S.Rep. No. 94–75, 94th Cong., 1st Sess. 23 (1975), 1975 U.S.C.C.A.N. 179, 201) (explaining the NASD self-regulatory system). In a federal district court, a defendant may rarely find a "peer" in the true definition of the word on a jury in a civil or criminal action, but the NASD disciplinary system specifically provides for peer review. Fellow members of the securities industry apply their common sense as well as their business expertise in determining whether a wrong has been committed by one of their own. It is doubtful any member of the securities industry would benefit from the lay jury system comprised of jurors who could not be made to understand, in the course of a short trial, the intricacies and variables that affect decision making in the securities industry. An unfortunate, inescapable byproduct of the NASD self-regulatory system, however, are hard feelings and vendettas by those charged with wrongdoing against those involved in the disciplinary process. Accord-

ingly, the Court .concludes that *Butz* factor number two is present; Hobbs' and Sherman's prosecutorial activities are likely to result in recriminatory lawsuits by disappointed parties.

### (c) *Butz* factor no. 3: sufficient safeguards exist in the regulatory framework to control unconstitutional conduct

■ Absolute prosecutorial immunity for behavior " 'intimately associated with the judicial process' " must be " 'both justified and bounded by the judicial traditions and procedures that limit and contain the danger of abuse.' " *Briggs I,* 569 F.2d at 24 (quoting *Apton v. Wilson,* 506 F.2d 83, 93 (D.C.Cir. 1974)). The Supreme Court as well as the Court of Appeals for this Circuit are well aware the severity of allegations that may arise against prosecutors; nevertheless, absolute immunity has been upheld for over six decades where appropriate safeguards are in place to protect the integrity of the judicial or, as in this case, the self–regulatory process despite the egregiousness of the prosecutor's or other quasi–judicial officer's behavior.

The adequate safeguards found to be in place by the Fifth Circuit before finding the DBCC absolutely immune from prosecution in *Austin,* the Court finds are in place here: There are three levels of appellate review, including the federal court of appeals sitting in the respective business district. NASD and its officers are subject to the SEC's broad supervisory and sanctioning powers, including the power to remove from office or censure any officer or director of a self-regulatory organization such as NASD for wilful violation of the rules or an abuse of position. *Austin,* 757 F.2d at 680. Moreover, NASD "must 'bring specific charges, notify such member or person of, and give him an opportunity to defend against, such charges, and keep a record' . . . Any sanction imposed must be supported by a statement of the Act which constituted the violation, the specific provision or rule violated, the sanc-

tion imposed, and the reasons therefore . . . The SEC closely scrutinizes the disciplinary process and must be satisfied the rules provide a fair procedure for disciplinary hearings." *Id.* at 680 (citing 15 U.S.C. §§ 78o–3(h)(1), 78o–3(b)(8), 78s(b)(1), (2)).

After the DBCC issues a formal complaint against a member such as Zandford, the respondent may request a hearing. "[N]o later than five business days before the hearing, respondents are required to provide the NASD committee staff or the complainant with any documentary evidence and the names of witnesses they plan to present at the hearing. Upon request, a complainant or NASD committee staff must also make available to respondents or their attorneys any documentary evidence intended for presentation at the hearing as an exhibit and the names of any witnesses they intend to call within five business days before the hearing.[9] The NASD procedures permit a member or associated person to be represented by an attorney. Respondents or complainants may use the hearing process to question witnesses and to present relevant evidence and argument . . . Although the hearing does not have the formality of a courtroom proceeding, both parties may reasonably question each other's witnesses, present evidence or other relevant material, and have an attorney represent them. The emphasis during the proceedings, however, is an orderly presentation and discussion of the facts and circumstances, without the formality of a court proceeding." [NASD Code at 11–13].

In sum, the defendants have met their burden of demonstrating that all three *Butz* factors are triggered or in place and, accordingly, the Court finds Hobbs and Sherman are not amenable to suit because they are entitled to absolute prosecutorial immunity for their alleged actions. The NASD, named a defendant pursuant to the theory of *respondent superior,* is also absolutely immune.

### D. Statutes of Limitations

Assuming *arguendo* that the defendants are not entitled to absolute immunity, NASD,

---

9. Zandford claims that Graner was a surprise witness in violation of his rights. Regardless, the decision of who to call as a witness is a prosecu-

torial function to which absolute immunity attaches.

Hobbs and Sherman still are entitled to judgment as a matter of law because Zandford, as aptly demonstrated by his Fourth Amended complaint, was on notice of his claims, yet he failed to file this civil action before the statutes of limitations for each count expired.

Zandford argues that his claims are not time barred pursuant to the doctrine of fraudulent concealment and the discovery rule. The Court disagrees as his own words in the *Fourth Amended Complaint* dictate otherwise.

### 1. Fraudulent Concealment

Before addressing the discovery rule and the statute of limitations for each count, the Court shall first briefly address the doctrine of fraudulent concealment by which Zandford makes an attempt to hide his failure to timely bring this civil action.

■■■ For fraudulent concealment to toll the statute of limitations, "there must be both fraudulent concealment on the part of defendant *and reasonable diligence on the part of plaintiff to discover his claim.*" *Johnson v. Amoco Oil Co.,* 790 F.Supp. 335, 338 (D.D.C.1992) (citing *Hobson v. Wilson,* 737 F.2d 1, 34–35 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985) (emphasis added)). NASD committed fraudulent concealment if it "engage[d] in some misleading, deceptive or otherwise contrived action or scheme, in the course of committing the wrong, that is designed to mask the existence of a cause of action"; mere silence, however, is not enough. *Amoco Oil,* 790 F.Supp. at 338 (citations omitted).

■■■ Zandford claims that NASD's failure to advise him that it had the trade confirmation tickets despite his counsel's inquiries is fraudulent concealment. Assuming the NASD's silence did rise to the level of fraudulent concealment, if Zandford was not aware of his claims, he did not exercise reasonable diligence to discover his claims. Zandford, however, has demonstrated in abundant detail by his *Fourth Amended Complaint* (*see infra* at 38–45), that he was suspicious, aware of sufficient facts to identify potential claims throughout the NASD disciplinary proceedings, and aware of his injury; therefore,

there is no need for this Court to decide whether fraudulent concealment occurred. *See Amoco Oil,* 790 F.Supp. at 338–339 ("If plaintiff had actual notice of facts sufficient to state his claim, then the Court need not decide the issue of fraudulent concealment.") (citations omitted).

### 2. Discovery Rule

As the statutes of limitations have expired on all of Zandford's six counts, the only other way he can survive the pending motion is by the application of the discovery rule. District of Columbia courts "have stated that the discovery rule 'emerged to redress situations in which the fact of *injury* was not readily apparent and indeed might not become apparent for several years after the incident causing injury had occurred.'" *Stager v. Schneider,* 494 A.2d 1307, 1316 (D.C.1985) (quoting *Ehrenhaft v. Malcolm Price, Inc.,* 483 A.2d 1192, 1201 (D.C.1984)) (emphasis added). The plaintiff cites *Stager* and another medical malpractice action, *Burns v. Bell,* 409 A.2d 614, 617 (D.C.1979), for the proposition that "[t]he 'discovery rule' is applied in cases where the relationship between the fact of the injury and the alleged tortious conduct is obscure." [Pl's supp. opp. at 14]. Zandford fails to see the relationship of the *discovery of the injury* to the application of the discovery rule. The plaintiff, who proclaimed his innocence from day one—the moment the original three Form U–5s were filed by Prudential Bache, no doubt knew the effect a NASD censure would have on his securities career. His injury being evident, and the relationship of the injury to the disciplinary process equally clear, Zandford knew or should have known with the exercise of reasonable diligence of his claims against Hobbs, Sherman and NASD.

Notwithstanding his successful profession of innocence in the multiple NASD forums in which he appealed the underlying disciplinary action, Zandford claims that from the time the administrative DBCC complaint was filed on April 29, 1987, until the "discovery" of the exculpatory evidence in 1992 as part of an arbitration proceeding with PB [*see supra* n. 1], he "had no reason to believe that the NASD or its employees had committed any

tortious acts," and that he believed that Prudential Bache "was the culprit." [Pl's supp. opp. at 6]. The Court disagrees.

The letters Zandford "discovered" in December 1992 (eight years after the disciplinary process began) do not provide any information that Zandford did not know, or should have known with respect to his injury, long before the end of 1992. The first letter, dated June 17, 1987, indicates that, on that date, NASD was mailed the trade confirmations. [4th amend. compl., ¶ 57]. The trade confirmations were just one of several items [*see supra* n. 4] that Zandford had asked NASD to seek on March 6, 1989 and assumed as of May 5, 1989 date that NASD had not obtained and/or was uninterested in obtaining from PB [pl's supp. opp., exh. 5]. By March 6, however, as illustrated by the letters from Zandford's counsel, both Zandford and his counsel knew that NASD has no basis for its prosecution. *See supra* at 9–11.

A second letter, dated August 5, 1988, shows that Sherman was providing Graner with confidential documents with an understanding that he would keep the documents confidential to prepare him for his testimony before the DBCC October 4, 1988 hearing [4th amend. compl., ¶ 65]. Zandford listened to Graner testify at the hearing, and his counsel cross examined the witness. Moreover, Zandford's counsel personally provided Hobbs and Sherman with a copy of the settlement agreement and wording of the amended Form U–5 [*id.*, ¶¶ 45, 98–99, 147–148 [10]]. Hence, Zandford knew that, despite any questioning by Sherman or answers by Graner that conflicted with the settlement agreement and the amended Form U–5, Sherman was fully aware of the settlement when he was questioning Graner before the DBCC.

To support the racial element of his complaint, Zandford points to a third letter that was written by Lukas and addressed to Sherman and which contains racial epithets against Zandford. [*Id.*, ¶ 69]. Zandford, however, had been aware of this September 25, 1988 correspondence since the October 4,

1988 hearing or, at the latest, since the January 31, 1989 DBCC decision as it was used as evidence by the NASD. [*See* DBCC decision at 2].

Finally, Zandford refers to a fourth letter dated August 9, 1984, by which Joan S. Bocina of PB admitted "[t]he firm [PB] also felt that Mr. Lukas had not established administrative procedures in regard to his duties, which were sufficient to meet this firm's standards." [4th amend. compl., ¶ 49]. An assertion that receipt of a copy of this letter first put the plaintiff on notice of the fact PB should have been, but was not, named as a respondent in the DBCC complaint is belied by Zandford's assertions that he had been complaining about Lukas' supervision long before he was suspended by him in February 1984. In paragraphs 21–22 of the Fourth Amended Complaint, Zandford states that "Lukas' abusive and dangerous personality ... affected the operations of the branch office ... further compounded by his incompetence, and extended absence from the office ... In November of 1993, the staff of the [PB] Annapolis office contacted Graner and demanded the immediate removal of Lukas ..."

Thus, these documents provide little, if any, new information with respect to Zandford's six counts, all of which he was aware before December 1992. The plaintiff's Fourth Amended Complaint, read liberally giving all due deference to the plaintiff's claims, unquestionably reveals that he knew or should have known about all six of his claims *years* before the statutes of limitations expired. Thus, without deciding whether the discovery rule would be applicable to this type of scenario, the Court concludes that the plaintiff's claims accrued before 1992 as illustrated by Zandford's own words spelled out below.

### 3. Statutes of Limitations

Zandford concedes that "[t]here is no question that [his six] claims, absent the application of an exception to the statutes governing limitations on actions, would be time-barred."

---

**10.** The Court is referencing the first paragraph no. 45 that begins on page 7 and continues to page 8. *See supra* no. 8.

[Pl's supp. opp. at 2]. Neither the discovery rule nor the theory of fraudulent concealment tolled the statutes of limitations on Zandford's six claims.

### a. Count I

■ "The essence of [count I] concerns the actions by the defendants while undertaking their investigation of Mr. Zandford." [*Id.* at 8]. Zandford claims that the actions that support count I occurred from 1987–1988. [4th amend. compl., ¶ 75]. Zandford concedes that the applicable statute of limitations period for a cause of action for conspiracy pursuant to 42 U.S.C. § 1985(3) is three years. [Pl's supp. opp. at 8 (citing *Hobson* 737 F.2d at 32) ]. Thus, the statute of limitations expired in 1991, at the latest. This action was filed in 1993.

Zandford professed his innocence from the inception of the disciplinary process—before Hobbs and Sherman presented any evidence to the DBCC for the issuance of the administrative complaint in 1987. In Zandford's words, he *knew* that

> [p]rior to the NASD's [DBCC's] filing of its unjustified complaint, Zandford's attorneys had met with Hobbs and Sherman on several occasions, and provided them with factual background of the lawsuits, *as well as the circumstances in the Annapolis office, and those leading to Zandford's unlawful suspension and termination.* Despite the factual and compelling nature of this evidence, Hobbs and Sherman intentionally ignored the truth, as well as the findings of two attorneys' investigation and their offer to provide them with the relevant documents. Instead, Hobbs and Sherman proceeded to prosecute Zandford based on unfounded and unproven allegations contained in client lawsuits which had been instigated by PB and settled out of court, and PB's malicious and baseless allegations and misrepresentations motivated by Lukas['] and Graner's racial hatred of Zandford.

[4th amend. compl., ¶¶ 37–38 (emphasis in original) ]. All of these alleged actions occurred in 1987, the same year that Zandford *knew* that

Hobbs and Sherman knew that PB's original filings of its Form U–5 were untruthful, and they also knew that the Settlement Agreement contained the factual representations which clearly indicated that Zandford was given permission by PB to make deposits into his clients' accounts. Hobbs and Sherman also knew that Zandford was not with PB after February 9, 1984, and had not received a commissions cheque for the month of February.

[*Id.*, ¶ 45 (emphasis omitted) [11] ] Zandford also *knew* in 1987 that the NASD was in possession of Zandford's amended U–5 which also contained the same factual language as contained in the Settlement Agreement [*see supra* at 7; *see also* 4th amend. compl., ¶¶ 99, 35]. Additionally, he *knew* that

> [i]n regards to the three counts of excessive trading [in the DBCC complaint], Hobbs and Sherman, [sic] had been informed by Zandford and his attorneys regarding the factual merits of the client complaints, how they were instigated by PB, the shady financial backgrounds of the plaintiffs, and why those lawsuits were settled. These three counts of the NASD's complaint were simply based on the unfounded allegations contained in the client lawsuits which were instigated by PB, and settled out of court by PB.

[4th amend. compl, ¶¶ 103–104].

Despite all of these events that would give rise to suspicion of a civil rights conspiracy, Zandford failed to bring his cause of action prior to the expiration of the three-year statute of limitations.

### b. Count II

■ Zandford brings count II pursuant to the Fifth Amendment to the United States Constitution. [Pl's supp. opp. at 9]. In his supplement opposition, Zandford claims the same 1987 and 1988 acts on the part of Hobbs and Sherman noted above for count I form the basis of count II [pl's supp. opp. at 9]; however, his complaint focuses on the October 1988 hearing and Graner's alleged concocted testimony [4th amend. compl., ¶¶ 82, 84, 85]. His opposition also references a right "to obtain all documentary evidence

11. *See supra* no. 10.

to be presented to the DBCC," "a right to be present and to be represented," "a right to submit additional evidence at the discretion of the DBCC". [Pl's supp. opp. at 9].

■ The Court has thoroughly read the plaintiff's Fourth Amended Complaint multiple times, and it does not find where the plaintiff alleges he did not receive copies of evidence *to be presented* to the DBCC pursuant to the NASD Code of Procedure, which provides in pertinent part: "Upon request, a complainant or NASD committee staff must also make available to respondents or their attorneys any documentary evidence *intended for presentation* at the hearing as an exhibit and the names of any witnesses they intend to call within five business days before the hearing." [NASD Code at 13 (emphasis added) ].[12] Instead, Zandford complains he did not receive evidence that *was not presented to the DBCC*—the trade confirmation tickets. Either way, Zandford knew of the existence of the evidence at and prior to the hearing. Pursuant to the NASD Code of Procedure, it is the respondent who is "nevertheless obligated to present all evidence in [his] defense, since such material may not be added to the record on appeal in the absence of exceptional circumstances." [*Id.* at 18].

Pursuant to Zandford's theory, his causes of action accrued on October 4, 1988, when he attended the DBCC disciplinary hearing at which he was represented by counsel who cross-examined NASD's witnesses. Zandford and his counsel heard and saw the presentation by Sherman of the NASD case; he *knew* from that date forward that

Hobbs and Sherman relied on a formula that measured volume and frequency of trades in comparison to the size of the accounts. The more trades Hobbs and Sherman could attribute to Zandford, the better their chance to prove the first three counts [of] excessive trading ... against him.

[4th amend. compl., ¶ 53]. Further, Zandford *knew*

Hobbs and Sherman ... manipulated the record of stock transactions to suit their

fraudulent purposes. By knowingly, and intentionally not differentiating between stock splits and dividends, margin liquidations versus actual sales, and between solicited and unsolicited trades, they fraudulently attributed more trade to Zandford. [*Id.*, ¶ 54]. Zandford *knew* at the 1988 hearing that Hobbs and Sherman were making such representations before the DBCC despite the fact that they

knew that Zandford had been suspended by Lukas on or about February 9, 1984, and that he could not have been responsible for all of the alleged transactions for the period alleged in NASD's complaint against Zandford. Hobbs and Sherman [and most importantly Zandford], knew this fact for almost 15 months prior to the DBCC disciplinary hearing against Zandford.

[4th amend. compl., ¶¶ 55–56].

Zandford concedes that the applicable statute of limitations period for count II is three years pursuant to D.C.CODE § 12–301(8) [pl's supp. opp. at 9], thus the claims arising out of the hearing expired in 1991. This claim, filed in 1993, is time barred.

### c. Count III

■ Zandford concedes that pursuant to D.C.CODE § 12–304 the statute of limitations period for malicious prosecution is one year from the date a party prevails in an action. [Pl's supp. opp. at 10 (citation omitted) ]. Zandford prevailed on appeal to the SEC on November 5, 1991, five months short of two years prior to the filing of this civil action.

Although Zandford had no right to bring the action until November 1991, all of his suspicions and knowledge as outlined in the Fourth Amended Complaint demonstrate he had known of this claim since the DBCC issued the complaint. When the NASD Board of Governors reversed the DBCC, it gave support to Zandford's theories, suspicions and his profession of innocence. In June of 1989, Zandford *knew* that

the Board of Governors of the NASD, *reversed the DBCC's decision based on the same set of facts that Zandford and his*

---

12. Furthermore, "NASD procedures do not require the disclosure of exculpatory evidence".

*Mister Discount Stockbrokers, Inc. v. SEC,* 768 F.2d 875, 878 (7th Cir.1985).

*attorneys had urged the Staff to consider and investigate prior to their filing of their complaint, and opening the 'regulatory floodgate' against Zandford, which destroyed his business.* The Board of Governor's, however, in the same breath *and in order to serve the remedial purposes of NASD's disciplinary proceedings against Zandford,* censured and fined Zandford $2,000 for having placed his funds in client accounts. This action was based on the [sic] Hobbs' and Sherman's original fraudulent complaint, in which PB was not cited as a respondent.

[*Id.*, ¶¶ 116–117 (emphasis in original)]. For years leading up to the SEC reversal, Zandford knew or should have known of his claim for malicious prosecution; however, his cause of action was not filed until after the statute of limitations expired.

### d. Count IV

■ The first paragraph under count IV of the plaintiff's Fourth Amended Complaint incorporates by reference all the previous paragraphs [*see id.*, ¶ 130], and in his supplemental opposition, the plaintiffs specifically directs the Court to paragraphs 45–79 of count III as the allegations to support his claim for common law conspiracy (count IV). Paragraphs 46, 47, 48, 49, 50, 51, 52 and 72 all explain the statutory and evidentiary reasons why Prudential Bache should have been, yet was not named as a respondent in the DBCC complaint filed on April 29, 1987. Zandford knew that

Hobbs and Sherman knew that while Zandford was employed by PB, PB was a controlling person with respect to Zandford's conduct under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). They knew that PB was liable for any alleged violations of the law by Zandford based on the common law principle of "Respondeat Superior", and that securities law doctrine of "controlling persons" liability, as well as the rules of the NASD and the NYSE.

[*Id.*, ¶ 46]. Zandford *knew* that

[i]n order to cover up their failure to supervise Lukas, and the Annapolis branch office, PB and Graner suppressed the results of an internal audit that had clearly

vindicated Zandford of any wrongdoing. PB and Graner then used Zandford as a *scapegoat* for their regulatory and managerial violations. NASD's complaint against Zandford is indicative of this fact, in that PB was not named as a Respondent.

[*Id.*, ¶ 28 (emphasis in original)]. And, Zandford *knew* on April 29, 1987, that

[i]n their personal zeal to prosecute Zandford, Hobbs and Sherman ... unlawfully dismissed PB, Zandford's' employer, as a party to its complaint ...

[*Id.*, ¶ 40].

Zandford concedes that the applicable statute of limitations period for common law conspiracy is three years pursuant to D.C.CODE § 12–301(8) [pl's supp. opp. at 10], and thus it expired on April 29, 1990.

### e. Count V

■ Zandford concedes that his claim for tortious interference with a contract is governed by the three-year statute of limitations set forth in D.C.CODE § 12–301(8). [Pl's supp. opp. at 10]. The contract to which Zandford is referring is the settlement agreement Zandford and Prudential Bache entered into on November 25, 1986, and pursuant to which Zandford sued Graner for a breach that he claims occurred during Garner's testimony during the October 4, 1988 DBCC hearing.

According to Zandford, he *knew*

[o]n October 4, 1988, PB materially breached a valid contract it had entered into with Zandford during an NASD District Business Conduct Committee ... disciplinary hearing against Zandford.

[4th amend. compl., ¶ 1]. Zandford listened to Garner's direct examination by Sherman, then to cross examination by Zandford's counsel. [*Id.*, ¶ 100]. Zandford heard Graner deny the existence of the amended Form U–5, and he noted that Sherman never acknowledged in direct examination the existence of the amend Form U–5—a copy of which Zandford, himself, had provided for Hobbs and Sherman. [*Id.*, ¶¶ 42–43, 66–67, 99–100]. Zandford *knew* on October 4, 1988, that

**24**

Graner's testimony exceeded the scope of the NASD's complaint against Zandford, and was a 'complaining witness' testimony in that it revived and further perpetrated Lukas and PB's false and malicious reasons for terminating Zandford, on which the NASD had based its investigation and complaint against Zandford. Hobbs and Sherman knowingly relied on Graner's testimony which was motivated by racial animus as part of their unlawful scheme.

[*Id.*, ¶¶ 113, 142]. Zandford also *knew* that ... Hobbs and Sherman knew of the Mutual Release and Settlement Agreement of 1986, and the circumstances surrounding it. A copy of this Agreement had been provided to the NASD by Zandford's counsel upon NASD's specific request in March of 1987 ...

[*Id.*, ¶ 98] and, moreover, Zandford *knew* that Hobbs and Sherman ... knew that Graner's malicious and manufactured testimony was *prohibited* by paragraph 3, and would breach the Settlement Agreement and damage Zandford's career and reputation.

[*Id.*, ¶ 147].

With this information, Zandford did act with due diligence in bringing his action against Prudential Bache shortly before the expiration of the statute of the limitations [*id.*, ¶ 2], but he made what has proven to be an unfortunate judgment call to pursue only Prudential Bache and not the NASD. Zandford *knew* that he had a cause of action against Hobbs and Sherman on October 4, 1988; thus, the statute of limitations expired in 1991.

### f. Count VI

 ·Zandford concedes that intentional interference with business relations is governed by the three-year statute of limitations set forth in D.C.CODE § 12–301(8). [Pl's supp. opp at 10]. Zandford complains that Hobbs and Sherman interfered with his business relationships by bringing the "baseless claims" against him [4th amend. compl., ¶ 160], and claims Hobbs and Sherman knew the claims were baseless before the DBCC issued the complaint [*id.*, ¶ 38]; thus, the statute began running on April 29, 1987, at the very latest, when the DBCC issued the

complaint, and expired in 1990, three years before this civil action was filed.

In sum, Zandford's own words taken directly from the *pro se* Fourth Amended Complaint unquestionably demonstrate that Zandford knew of all six causes of action on the date they accrued. Accordingly, defendants Hobbs, Sherman and NASD are entitled to judgement as a matter of law on Counts I, II, III, IV, V and VI, as all claims are barred by the applicable statute of limitations.